13-4865 (L)
U.S. v. Rivernider

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————————

August Term, 2015

(Argued: December 7, 2015    Decided: July 7, 2016)

Docket No. 13-4865-cr; 14-384-cr; 14-452-cr; 14-4533-cr; 14-4582-cr

———————————

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

ROBERT RIVERNIDER, ROBERT PONTE

*Defendant-Appellants.*

———————————

B e f o r e:

LIVINGSTON and LYNCH, *Circuit Judges*, and RAKOFF, *District Judge.*[*]

———————————

Defendants Robert Rivernider and Robert Ponte appeal from judgments of conviction in the United States District Court for the District of Connecticut (Robert N. Chatigny, *Judge*), entered upon their guilty pleas, for multiple counts

———————————

[*] The Honorable Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

of wire fraud in violation of 18 U.S.C. § 1343 and conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, and, as to Ponte, tax evasion in violation of 26 U.S.C. § 7201. The wire fraud convictions arise from defendants' orchestration of a Ponzi scheme and a related fraudulent real estate scheme. Rivernider primarily argues that the district court erred in denying his pro se motion to withdraw his guilty plea, or, alternatively, by failing to appoint substitute counsel to make such a motion. Defendants also challenge their sentences and the $22,140,765.99 restitution order entered by the court.

We conclude that the district court did not err in denying Rivernider's pro se motion to withdraw his guilty pleas. There was a sufficient factual basis for Rivernider's plea and Rivernider's conclusory allegations of attorney coercion are insufficient to justify withdrawal of his guilty plea or the appointment of substitute counsel. We also reject defendants' challenges to their sentences and to the restitution order.

The judgments of conviction are thus AFFIRMED

---

MARJORIE M. SMITH, Law Office of Marjorie M. Smith, Brooklyn, New York, *for Defendant-Appellant* Robert Rivernider.

JODI ZILS GAGNÉ, The Law Offices of Jodi Zils Gagné LLC, Bristol, Connecticut, *for Defendant-Appellant* Robert Ponte.

CHRISTOPHER W. SCHMEISSER, Assistant United States Attorney (John H. Durham and Marc H. Silverman (of counsel), Assistant United States Attorneys, *on the brief*), for Deirdre M. Daly, United States Attorney for the District of Connecticut, New Haven, Connecticut.

---

GERARD E. LYNCH, *Circuit Judge*:

Defendants Robert Rivernider and Robert Ponte appeal from judgments of conviction in the United States District Court for the District of Connecticut (Robert N. Chatigny, *Judge*), following their guilty pleas to multiple counts of wire fraud in violation of 18 U.S.C. § 1343 and conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. Ponte also pled guilty to two counts of tax evasion in violation of 26 U.S.C. § 7201.[1] The convictions arise from the defendants' orchestration of a Ponzi scheme and a related real estate scheme, in which the defendants induced victims to purchase properties using mortgages based on an inflated appraisal price while pocketing the difference between the actual sales price and appraisal price as a "marketing fee," without disclosing the fee to the buyer. Both defendants proceeded to trial, but pled guilty prior to its conclusion.

Rivernider primarily argues that the district court erred by denying his pro se motion to withdraw his guilty plea on the ground that his plea lacked an

---

[1] Rivernider was charged with, and pled guilty to, two counts of conspiracy to commit wire fraud and sixteen counts of wire fraud. Ponte pled guilty to two counts of conspiracy to commit wire fraud, fourteen counts of wire fraud, and two counts of tax evasion.

adequate factual basis and was coerced, or, alternatively, by failing to appoint

substitute counsel to make the motion to withdraw his plea. He additionally

challenges his 144-month sentence as substantively unreasonable. Ponte does not

challenge his conviction, but argues that his 90-month sentence is both

procedurally unreasonable in that district court erroneously applied several

enhancements in calculating his advisory Guidelines range and substantively

unreasonable. Both defendants challenge the $22,140,765.99 restitution order

entered by the district court.

We conclude that the district court did not err in failing to appoint new

counsel to represent Rivernider with respect to his motion to withdraw, or in

denying his pro se motion, because there was a sufficient factual basis for

Rivernider's plea and because Rivernider did not sufficiently allege an actual

conflict of interest between himself and his attorney. We also reject the

defendants' challenges to their sentences and to the restitution order.

Accordingly, for the reasons given herein, we affirm the judgments of conviction.

## BACKGROUND

### I.     The Underlying Fraud

Rivernider and Ponte organized and ran two related fraudulent schemes.

The first, which Rivernider began in 2005, was called the "No More Bills"

4

("NMB") program. Through the NMB program, the defendants solicited funds from clients who were promised a 10% monthly return that would be used to pay off the client's debts. After receiving financial information from investors, the defendants generated investor plans, including graphs and tables setting forth expected returns. Although Rivernider engaged in some investment activity over the course of the fraud, the money used to make monthly payments to clients principally came from the principal or contributions of other clients, and the program thus functioned as a Ponzi scheme.

Rivernider controlled the administrative aspects of the scheme and the NMB bank accounts. Ponte brought in investors and also played an active role in creating and transmitting investor plans. Both defendants misled clients about the source and reliability of the promised returns. For example, Ponte told multiple clients that Rivernider was investing in offshore foreign currency trading and Panamanian real estate and natural resources. Rivernider represented to some clients that he had a hedge fund in Hong Kong that yielded high returns. All of those representations were false.

At some point in the scheme, the incoming funds became insufficient to cover the promised returns to NMB investors. Rivernider and Ponte were aware of problems with the NMB program by fall 2007. In an email dated September

5

11, 2007, Ponte told Rivernider that "[a]ll of [the promised 10% return on a client's] funds are coming from principal, not interest." G.A. 243. Rivernider responded by stating that "[s]hould I ever actually make money on something else I can then pay profits but for now if I return princip[al] after losing it all, I should be a hero." *Id.* at 245.

The defendants concealed the problems in the NMB program from current investors, and continued to solicit new clients, through the fall of 2007. For example, on September 10, Ponte provided wiring instructions for a new NMB client, and on October 23, told a client that the client could improve his investment return if he deferred receipt of the return then due. Rivernider and Ponte also discussed the possibility of altering payment plans for existing clients in order to reduce their current obligations.

As payments to clients became increasingly sporadic, Ponte's assistant sent Ponte an email asking what he should tell people who inquired about their monthly payments. Copying Rivernider on the email, Ponte responded that same day:

> You can send the following only to people that ask:
>
> Most of you are aware of the current mortgage industry crunch which in turn creates a large amount of foreclosures as well as fraud. This has caused many of

6

our NMB clients being scrutinized, by mortgage companies and the client bank. Because of this and other lender issues NMB is responding as best we can. All of following is so we can keep our program working for many months and years to come. So in some cases we are slowing down payments and paying minimum amounts, in some cases we are waiting a few weeks to payout, but will make payments before they are late. NMB is under pressure right now to show that bills are being paid down and to make sure we are not an investment company, paying appropriate taxes and or not [l]aundering money. Thank you to the Patriot Act. Over the next few weeks when we show that we and our clients are in compliance, all bills w[ill] be updated and full payouts will get back on track.

G.A. 376. Payments to clients, which had become increasingly irregular in the fall of 2007, ceased altogether in early 2008.

The second fraud was a real estate scheme. Using a company owned by Rivernider called Cut Above Ventures, the defendants induced victims – including current and former investors in the NMB scheme – to buy condominiums in Florida and cabins in Tennessee as investment properties through an "incentive program." Under the incentive program, Cut Above Ventures would provide the down payment, pay the mortgage for two years, and cover other costs relating to the property. To make money on this scheme, Cut Above Ventures would, prior to the sale, reach an agreement on price with the seller, seek an appraisal of the property at a figure in excess of the sale price, and

7

procure a mortgage loan for the buyer based on the inflated appraisal price. Cut Above Ventures could then extract a "marketing fee" from the difference between the inflated mortgage loan and actual sale price without disclosing the fee to the buyer. The mortgage applications used to purchase properties did not disclose the incentive program or the true sale price of the property to lenders. Additionally, some mortgage loan applications contained other misrepresentations, such as inflated borrower income figures.

Rivernider again principally controlled the financial aspects of the scheme while Ponte principally recruited buyers. The scheme also involved Tosha Wade, a Florida real estate sales representative, and Shellie Kemp, a mortgage consultant with Wells Fargo. Wade helped sell properties for Rivernider. She testified at trial that the common steps taken to commit mortgage fraud included: (1) concealing from lenders the incentive deals used to recruit customers; (2) classifying an investment property as a primary or secondary residence on mortgage loan applications to improve financing terms; (3) pushing the purchase of multiple properties at the same time to conceal a borrower's true liabilities; (4) manufacturing income figures to qualify unqualified buyers; (5) hiding the source of the money provided by buyers at closing; and (6) pricing sale contracts

8

so as to cover the cost of the undisclosed marketing fees. Wade also testified that Rivernider became angry when Wade disclosed the incentive plan to lenders.

Kemp, in her role as a Wells Fargo mortgage consultant, participated in the scheme by processing fraudulent loan applications. At one point, Wells Fargo investigated Kemp and temporarily suspended her from doing business with Rivernider; however, once the "marketing fee" extracted by Cut Above Ventures was no longer appearing on the loan documents, she was allowed to continue doing business with him. In total, Rivernider purchased 104 properties through Cut Above Ventures.

## II.    The Defendants' Guilty Pleas

Trial commenced on February 7, 2013. After about ten days of trial, Rivernider moved for leave to enter a guilty plea to all eighteen counts in the indictment. As part of that application, Rivernider signed an admission of offense conduct that described the NMB and real estate schemes in detail. In that statement, Rivernider admitted that he participated in both schemes knowing their fraudulent nature. At the change of plea hearing, Rivernider affirmed that he was satisfied with the services of his counsel – stating that "[t]hey've been wonderful," G.A. 96 – and that no one had threatened or pressured him to

9

change his plea. Both the government and defense counsel agreed that the admission of offense conduct was sufficient to allow the court to accept his plea without a lengthy oral recitation by Rivernider of the factual basis for his plea. Rivernider then acknowledged on the record that participants in the NMB program believed payments were being made from investment returns when most of the money that was being paid out came from other participants' investments. Rivernider also acknowledged that he had made misrepresentations in connection with the property scheme and the misrepresentations made to lenders were material. The court subsequently accepted Rivernider's plea.

About one week after Rivernider pled guilty, Ponte also asked for leave to enter guilty pleas to eighteen of the twenty counts against him. In his petition, Ponte admitted that he solicited funds for the NMB program "knowingly and willfully, and with intent to defraud." G.A. 123. Ponte further admitted to recruiting borrowers to take out financing to purchase investment properties, making material false representations to borrowers and lenders, and "willfully, knowingly, and intentionally defrauding the lenders." G.A. 124. Following a change of plea hearing, Ponte's plea was accepted by the court.

## III.  Riverider's Motion to Withdraw His Plea

In anticipation of sentencing, Riverider requested a departure or variance from the Guidelines sentence recommendation based on diminished capacity, contending that he suffered from reduced executive functioning.  The district court held an evidentiary hearing to determine whether such a departure or variance would be appropriate.  Towards the end of the hearing, the district court indicated that it was unlikely to grant such a departure or variance:

> [T]he most salient aspect of Mr. Riverider's offense conduct is the amazing dexterity he displayed in being able to pull this off for as long as he did.  It's not only not a case of a person lacking the traits one associates with executive functioning, it's the opposite. . . .  I couldn't orchestrate a real estate fraud . . . and keep track of it all and make sure that people who need money are getting it and figuring out ways to explain to people who aren't getting it why they aren't getting it and coming up with excuses that may hold them at bay. I couldn't do it.  To me, it requires a vast amount of executive functioning.
>
> So on its face, the idea that he lacked executive function is simply just so implausible.
>
> Did he have weaknesses in executive functioning? Okay, yeah.  Are they pertinent to sentencing? Yeah, probably.  Is he entitled to a downward departure?  No, no, he's not.  He's not.

G.A. 562.

11

Five days after the conclusion of the evidentiary hearing, Rivernider's attorney, James Bergenn, filed a motion to withdraw as Rivernider's counsel on the ground that he had been discharged. The district court denied that motion as Rivernider had not shown cause. One day later, Bergenn requested permission for Rivernider to file a pro se motion to withdraw his plea. Bergenn represented that the basis for the motion was Rivernider's belief that he lacked the mens rea necessary for his charged crimes.

After receiving permission from the district court, Rivernider submitted a pro se motion seeking to withdraw his plea. In the course of the lengthy motion, Rivernider argued, among other things, that the indictment contained false information regarding his criminal activity, that an FBI agent misled the grand jury, that Wade had testified falsely at trial, and that he lacked the mens rea to commit fraud because he had acted in good faith. Rivernider also argued that he was not capable of pleading guilty at the plea hearing because: (1) he was told that Ponte would plead guilty as well, and Ponte did not do so immediately; (2) the government had presented false information to the court, which Rivernider was only able to correct after "nearly having to pull Mr. Bergenn's arm off," G.A. 642; and (3) his plea was entered on the basis of inaccurate advice from Bergenn.

With respect to the last point, Rivernider specifically claimed that:

> Mr. Rivernider spent 2.5 days with Mr. Bergenn being told that he had a serious deficiency, brain damage, and that he had to plead guilty because of it. These 2.5 days can be likened to the time Mr. Rivernider spent on diesel therapy, specifically two days in shackles on a bus driving through the country with a bologna sandwich. Mr. Bergenn did not shackle Mr. Rivernider. Mr. Rivernider, reluctantly entered a guilty plea based on counsels advice, which after two days of hearings on the subject appears to have been inaccurate.

*Id.* Rivernider additionally claimed that Bergenn was ineffective because Bergenn "refused to go back to trial after reading [an expert] report . . . show[ing] th[at] . . . Rivernider has low executive functioning." G.A. 644.

Two days later, Rivernider argued his motion in court. During his oral presentation to the court, Rivernider made no reference to Bergenn's conduct. The district court subsequently denied Rivernider's motion on the record. The court specifically noted Rivernider's allegations against Bergenn, but found that they did not warrant any kind of relief because they were "conclusory in nature" and were "contradicted by [Rivernider's] sworn statements" made at the plea hearing. G.A. 740. After the court denied Rivernider's motion to withdraw his guilty plea, Rivernider consented to Bergenn's continued representation at sentencing.

13

## IV.  Sentencing

Immediately after denying Rivernider's motion to withdraw his guilty plea, the district court conducted a sentencing hearing.  After concluding that Rivernider was not entitled to a departure or variance for diminished capacity, substantial assistance to the government, or acceptance of responsibility, the district court calculated Rivernider's Guidelines range as 324 to 405 months.  The court sentenced Rivernider principally to 144 months' imprisonment and ordered restitution to be paid at $500 per month, although it did not enter a restitution order at the time.

The district court sentenced Ponte approximately one month after Rivernider.  Ponte's Presentence Report's Guidelines recommendation included enhancements for loss amount, number of victims, use of sophisticated means, and abuse of a position of trust.  Ponte objected to all of these enhancements, and also requested acceptance-of-responsibility and minor-role reductions.  The district court rejected all of Ponte's arguments and calculated Ponte's Guidelines range as 210 to 262 months.  The court sentenced Ponte principally to 90 months' imprisonment on the fraud counts, and 60 months' imprisonment on the tax evasion counts, to be served concurrently.  The district court also ordered

restitution, to be paid at a rate of $300 per month, but again declined to enter a restitution order at the time.

## V.    Restitution

The government submitted a proposed restitution order and supporting documentation about three weeks after Ponte's sentencing.  The government calculated restitution for the NMB program by calculating the total investments made by the victim-investors within the last ten months of the scheme (as earlier investors may have already recovered their principal given the promised 10% monthly return), and reduced that amount based on identified payments made to individuals and "pattern payments" (payments that appear to be related to an individual but could not be identified with certainty).  For the real estate scheme, the government considered only losses incurred by lenders asserting that it would be too difficult to calculate losses to borrowers.  To calculate losses to lenders, the government identified the total unpaid principal for each of the 104 loans, and reduced the total unpaid principal by funds generated by the sale of the property or, where the property had not been sold, the fair market value of the property.

Rivernider objected to the proposed restitution order, challenging the government's methodology, the accuracy of the restitution order in light of the

15

lack of complete financial records, and the inclusion of lenders as "victims" where the lenders had participated in the fraud.  Ponte did not object to the proposed restitution order.

On November 25, 2014, the district court issued a written decision adopting in large part the government's proposed methodology.  The district court did, however, exclude from the restitution calculation twelve "reinvestor" victims who had previously made a profit from the NMB program, even if they lost money in the last ten months of the scheme.  The district court entered a restitution order in the amount of $22,140,765.99.[2]

## DISCUSSION

### I.    Rivernider's Motion to Withdraw His Plea

Rivernider's primary argument on appeal is that the district court erred both in denying his pro se motion to withdraw his plea and in failing to appoint new counsel to make such a motion.  He argues first that the district court should have allowed him to withdraw his guilty plea because he did not admit to conduct constituting an offense during his plea hearing and because the record

_____

[2] Of the $22,140,765.99, $837,325.62 derived from losses to NMB investors and $21,303,440.37 from losses to lenders pursuant to the real estate scheme.

16

sufficiently demonstrates that his plea was not entered knowingly and voluntarily. Rivernider further argues that, even if the record is insufficient to establish that his plea lacked a factual basis or was involuntary, the district court erred in failing to appoint new counsel to assist him in making a motion to withdraw his plea.

### A.    Denial of Motion to Withdraw the Plea

"We review a district court's denial of a motion to withdraw a guilty plea for abuse of discretion and any findings of fact in connection with that decision for clear error." *United States v. Juncal*, 245 F.3d 166, 170-71 (2d Cir. 2001). Under Fed. R. Crim. P. 11(d)(2)(B), a defendant may withdraw a plea of guilty after it is accepted, but before sentencing, only if the defendant can show a "fair and just reason for requesting the withdrawal." The defendant bears the burden of showing "that there are valid grounds for withdrawal." *United States v. Couto*, 311 F.3d 179, 185 (2d Cir. 2002), *abrogated on other grounds by Padilla v. Kentucky*, 559 U.S. 356 (2010). "In general, to determine whether the defendant has shown a 'fair and just reason' to justify withdrawal, a district court considers, *inter alia*: (1) whether the defendant has asserted his or her legal innocence in the motion to withdraw the guilty plea; (2) the amount of time that has elapsed between the

17

plea and the motion . . .; and (3) whether the government would be prejudiced by a withdrawal of the plea." *United States v. Schmidt*, 373 F.3d 100, 102-03 (2d Cir. 2004). "Courts may also look to whether the defendant has raised a significant question about the voluntariness of the original plea." *Id.* at 103 (internal quotation marks and alterations omitted).

Rivernider first argues that his guilty plea was not supported by an adequate factual basis because his statements at the plea colloquy fail to establish that he had the requisite mens rea to be convicted of wire fraud. Pursuant to Fed. R. Crim. P. 11(f), a district court must assure itself "that the conduct to which the defendant admits is in fact an offense under the statutory provision under which he is pleading guilty." *United States v. Maher*, 108 F.3d 1513, 1524 (2d Cir. 1997). To this end, a district court "may rely on [the] defendant's own admissions, information from the government, or other information appropriate to the specific case." *United States v. Andrades*, 169 F.3d 131, 136 (2d Cir. 1999).

A conviction for wire fraud requires that the defendant possess "fraudulent intent," which in turns requires proof that the "defendant[] *contemplate[]* some actual harm or injury to the[] victims." *United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006) (internal quotation marks omitted) (emphasis in

18

original). "Actual harm" includes the intentional withholding of material information from investors and lenders. *See United States v. Karro*, 257 F.3d 112, 118 (2d Cir. 2001).

The record contains sufficient evidence to establish a factual basis for finding that Rivernider intended to withhold material information. In addition to the evidence from the trial, including the testimony of victims who were unaware of the fraudulent nature of the NMB and real estate schemes and the testimony of Wade, a co-conspirator, Rivernider signed a detailed statement of offense conduct describing both schemes. In that statement, Rivernider admitted to

> knowingly and willfully participat[ing] in the obtaining of monies from NMB clients in that he knew clients were led to believe that almost all of their monthly payments . . . were being made from realized returns on already-actively paying investments when they were not, thereby specifically intending to deceive NMB clients in that he knew the clients would be placing their funds at a risk of loss more substantial than the risk represented to them, and he took their funds without insuring the clients were properly informed.

G.A. 89. With respect to the real estate scheme, Rivernider admitted in his statement of offense conduct that he

19

> caused to be represented in loan applications and other documents provided to the lenders a number of material misrepresentations, including, (i) the income earned by the respective borrower, which was routinely overstated; and (ii) the true earnest money payments coming from the borrower, which were routinely fronted by NMB funds at the direction of Rivernider.

G.A. 90. Those admissions, combined with the trial evidence and Rivernider's statements at the plea colloquy, establish a factual basis for finding that Rivernider possessed fraudulent intent with respect to both schemes.

Rivernider's argument to the contrary is based on a misunderstanding of the mens rea element required for a wire fraud conviction. Although certain statements made by Rivernider at the plea colloquy suggest that he did not subjectively intend to harm his victims,[3] such intent is not required for a conviction for wire fraud; it is sufficient that the defendant intentionally withheld information from investors. *See, e.g.*, *Karro*, 257 F.3d at 118; *United States v. Chandler*, 98 F.3d 711, 716 (2d Cir. 1996). Considering the record as a whole, there

---

[3] For example, Rivernider, when asked by the court what made him guilty, stated that he "didn't properly do my proper due diligence and ensure that what people believed was happening was happening." G.A. 105. When the court asked Rivernider if he knew that the NMB investors believed they would be getting 10% investment returns, Rivernider responded by stating that he "did everything [he could] to make sure that that was the case." *Id.* at 106.

can be no doubt that Rivernider intentionally withheld material information from investors and lenders.

Rivernider also argues that the plea colloquy is deficient because his plea was was not knowing and voluntary. However, sworn testimony given during a plea colloquy "carries such a strong presumption of accuracy that a district court does not, absent a substantial reason to find otherwise, abuse its discretion in discrediting later self-serving and contradictory testimony as to whether a plea was knowingly and intelligently made." *Juncal*, 245 F.3d at 171; *see also United States v. Hernandez*, 242 F.3d 110, 112 (2d Cir. 2001). Prior to accepting Rivernider's plea, the district court conducted an extensive plea colloquy. The court asked Rivernider a number of questions about his mental state and understanding of the proceedings. Nothing in Rivernider's answers indicated that he misunderstood the proceedings or was under any pressure to plead guilty. For example, the court asked Rivernider whether he had been treated for any mental illness "to determine whether [he] had a condition that could affect [his] ability to understand what's going on, to think about what's going on, and communicate effectively with [his] counsel and [the court]," to which Rivernider responded that "we should be fine." G.A. 96. The court also ascertained that

21

Rivernider's "mind [was] clear," that he was "capable of making important decisions" on the day of the plea hearing, and that he did not have any difficulty understanding the court. *Id.* Furthermore, Rivernider affirmed that no one had made any promises, threatened him, or put pressure on him to change his plea, and stated that he believed it was in his best interests to change his plea. Rivernider was unequivocal at the plea colloquy in stating that he was capable of pleading guilty and understood the consequences of such a plea. In short, there is no evidence in the record to support Rivernider's contention that he was not competent to plead guilty.

Finally, Rivernider contends on appeal that his guilty plea was coerced by counsel. His fifty-three page motion to withdraw his plea below, however, contains only two brief conclusory references to any possible coercion affecting his guilty plea. Specifically, Rivernider claimed that (1) Bergenn told Rivernider over the course of two and half days that Rivernider had to plead guilty because he had "a serious brain deficiency, brain damage," G.A. 642, and (2) Bergenn refused to go back to trial after he received the expert's report indicating that Rivernider had executive functioning deficiencies. Those two conclusory passages are insufficient to overcome the "strong presumption of accuracy,"

*Juncal*, 245 F.3d at 171, that is afforded to Rivernider's sworn testimony offered at the plea colloquy.      Although the record before us does not establish that Bergenn coerced Rivernider into pleading guilty (and subsequently refused to assist Rivernider in withdrawing his plea because of the resulting conflict of interest), to the extent that Rivernider alleges an ineffective-assistance claim predicated on these allegations, he is free to raise such a claim as part of a habeas petition pursuant to 28 U.S.C. § 2255.  Courts of appeals are generally "reluctant to address ineffectiveness claims on direct review" because "the constitutional sufficiency of counsel's performance is usually unripe for seasoned retrospection" on direct review.  *United States v. Salameh*, 152 F.3d 88, 160 (2d Cir. 1998).  When faced with such a challenge, an appellate court may "(1) decline to hear the claim, permitting the appellant to raise the issue as part of a subsequent petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255; (2) remand the claim to the district court for necessary factfinding; or (3) decide the claim on the record before [the appellate court]."  *United States v. Morris*, 350 F.3d 32, 39 (2d Cir. 2003).  Where, as here, the record is not sufficiently developed to allow us to review an ineffective-assistance claim, we decline to consider any such claim at this stage and dismiss that claim without prejudice to the filing of a § 2255 petition on that ground.

### B. Appointment of New Counsel

Rivernider argues that, even if the record is insufficient to show that the district court should have granted his pro se motion to withdraw his guilty plea, the district court nonetheless erred in failing to appoint new counsel to make that motion.

We suggested in *Hines v. Miller*, 318 F.3d 157, 162-63 (2d Cir. 2003), that two different types of Sixth Amendment claims are potentially at issue where a represented defendant who has submitted a pro se motion to withdraw his plea argues that he was denied proper representation in connection with the motion. One approach is based on the effectiveness of counsel's representation at the plea withdrawal stage, and is analyzed under the familiar standards for assessing the effectiveness of counsel deriving from *Strickland v. Washington*, 466 U.S. 668 (1984); since such claims usually involve assertions that counsel labored under a conflict of interest, the specific rules set forth in *Cuyler v. Sullivan*, 446 U.S. 335 (1980), and its progeny will generally be applicable. The other approach is based on the claim that the defendant was denied any representation at all in connection with his motion, and relies on cases like *Coleman v. Alabama*, 399 U.S. 1 (1970), and *United States v. Cronic*, 466 U.S. 648 (1984). In *Hines*, we collected

cases demonstrating that different lower federal courts had applied each approach. 318 F.3d at 163-64.

The former approach seems preferable to us, at least on the facts before us here. We note at the outset that our court has generally utilized an ineffective-assistance-of-counsel analysis based on *Strickland* and/or *Cuyler* in such cases. *See*, *e.g.*, *United States v. Davis*, 239 F.3d 283, 285-88 (2d Cir. 2001); *United States v. Moree*, 220 F.3d 65, 69-72 (2d Cir. 2000); *Lopez v. Scully*, 58 F.3d 38, 41-43 (2d Cir. 1995). *But see Hines*, 318 F.3d at 164-70 (Winter, J., dissenting). We do not believe that those cases foreclose the issue, since the approach taken may depend on the specific facts of each case or on the precise arguments made by the defendant, either in the district court or on appeal, but the tenor of our prior encounters with the issue is instructive.

More importantly, the ineffective-assistance approach seems to us consistent with both the facts of this case and with basic principles. There is no question that a defendant is entitled to counsel in connection with deciding whether to withdraw a guilty plea, which is certainly a critical stage of a criminal proceeding. *Davis*, 239 F.3d at 285-86. It is clear, however, that Rivernider *was* represented when deciding how to proceed when he became dissatisfied with his

25

guilty plea. He had a lawyer, Bergenn, who, as the record makes clear, consulted with Rivernider about his desire to withdraw his plea, and determined that he could not properly make such a motion because there were no valid grounds on which to make it.

The argument that Rivernider was entitled to have new counsel appointed at that stage, therefore, must rely on one of two propositions: that a defendant who wishes to withdraw his guilty plea has an absolute right to make a motion, and if his current counsel is unwilling to make the motion on his behalf, a new lawyer must be appointed to assist him in making the motion; or that the lawyer who refused to make the motion made a constitutionally defective decision either because she overlooked obvious lawful grounds on which a non-frivolous motion could be made or because she was hampered by an actual conflict of interest.

The argument that Rivernider was altogether deprived of counsel is based on the observation that, because the district court permitted Rivernider to make a pro se motion, he was, by definition, not represented by counsel in *making* the

motion.[4]  A counseled defendant, however, has no automatic right to insist that

his lawyer make motions that he would prefer be made, *see United States v.*

*Nersesian*, 824 F.2d 1294, 1322 (2d Cir. 1987), to make supplementary pro se

motions when his attorney declines to make them, *cf. McKaskle v. Wiggins*, 465

U.S. 168, 183 (1984), or to insist on new counsel whenever he and his attorney

differ on strategy, *Moree*, 220 F.3d at 71-72.  Only a few decisions in connection

with trial strategy are reserved to the defendant to make personally, *see Brown v.*

*Artuz*, 124 F.3d 73, 77 (2d Cir. 1997); for the rest, strategic decisions are confided

to counsel.  That is particularly so when the counsel's reason for declining to

make a motion is that there are no legal grounds upon which to do so.

Of course, the decision whether to plead guilty or proceed to trial is one of

the decisions on which the final say is the defendant's.  The decision whether to

plead guilty, however, is easily distinguishable from the decision whether to seek

to withdraw a guilty plea that has already been entered and accepted by the

court.  A defendant need have no legal grounds, or even a rational reason, to

proceed to trial.  That is his absolute right, whether or not the decision to reject a

---

[4] It is undisputed that Rivernider did not elect to proceed pro se for all purposes, or make the kind of knowing and intelligent waiver of his right to counsel that would be necessary to do so.

plea bargain would appear to an objective observer to be in his rational self-interest, and whether or not he has a legally viable defense. Once a plea is entered and accepted, however, the situation has changed. At that point, the defendant must make an application to the court, which may deny the motion unless sufficient legal grounds to grant it have been shown. *See, e.g.*, *United States v. Doe*, 537 F.3d 204, 210-11 (2d Cir. 2008); *United States v. Torres*, 129 F.3d 710, 715 (2d Cir. 1997); *see also* Fed. R. Crim. P. 11(d)(2)(B). Whether such grounds exist is a legal question, on which counsel's professional expertise must be brought to bear.

If counsel declines to make the motion, it does not follow that the defendant has a right to make a motion on his own behalf, or to demand that the court appoint substitute counsel. A defendant has a right either to counsel or to proceed pro se, *Faretta v. California*, 422 U.S. 806, 834 (1975), but has no right to "hybrid" representation, in which he is represented by counsel from time to time, but may slip into pro se mode for selected presentations.[5] *See Clark v. Perez*, 510

---

[5] We do not suggest that district courts lack discretion to hear from a represented defendant personally, nor do we criticize the district court for allowing Rivernider to make his pro se submission. We note only that Rivernider did not have a right to insist that the district court hear his application. Rivernider was not *denied* the assistance of counsel; rather, he was *permitted* to make a pro se application that he need not have been allowed to make.

F.3d 382, 395 (2d Cir. 2008). And it is well settled that a defendant may not disrupt proceedings by demanding new counsel whenever he differs from his lawyer's strategic, legal, or ethical judgments about how to conduct a case. To hold that a defendant who wishes to withdraw his already-accepted guilty plea has a right to do so with the assistance of counsel would either require defense counsel to make motions they regard as frivolous, or to require district courts to appoint new counsel for that purpose in every case in which a defendant has "buyer's remorse" about having accepted a plea agreement.

Accordingly, we conclude that the proper question, where a defendant's lawyer declines to move on the defendant's behalf to withdraw a guilty plea, is whether the lawyer's judgment fell outside the bounds of professional competence, so as to constitute ineffective assistance of counsel. In this case, we have already rejected on the merits Rivernider's claim that he had shown cause to withdraw his guilty plea. The only remaining basis in the record for an argument that Rivernider was denied the assistance of counsel in making a plea withdrawal motion is Bergenn's purported conflict of interest.

A defendant who argues that his counsel was constitutionally ineffective ordinarily "must establish both that counsel's conduct fell below an objective

standard of reasonableness and that but for this deficient conduct, the result of the trial would have been different, under the familiar standard established by *Strickland.*"  *United States v. Armienti*, 234 F.3d 820, 824 (2d Cir. 2000).  "However, where a defendant's ineffective assistance of counsel claim is based on an alleged conflict of interest, a defendant is entitled to a presumption of prejudice if he can demonstrate that his attorney labored under an actual conflict of interest and that the actual conflict of interest adversely affected his lawyer's performance." *United States v. Davis*, 239 F.3d 283, 286 (2d Cir. 2001) (internal quotation marks omitted).  The defendant thus need only prove that some "plausible alternative defense strategy or tactic might have been pursued."  *United States v. Levy*, 25 F.3d 146, 157 (internal quotation marks omitted).  Further, when "the court is sufficiently apprised of even the possibility of a conflict of interest, the court has an inquiry obligation, and must disqualify the attorney or obtain a waiver from his or her client if the inquiry reveals that an actual or potential conflict exists." *Armienti*, 234 F.3d at 823 (2d Cir. 2000) (alterations, citation, and internal quotation marks omitted).

Thus, allegations that counsel coerced a defendant's guilty plea, if adequately set forth, are sufficient to allege an actual conflict of interest and the

defendant has the right to have substitute counsel appointed to make the motion to withdraw the plea unless the defendant has "waive[d] his right to conflict-free counsel or his right to counsel altogether." *Davis*, 239 F.3d at 287. The right to substitute counsel is not automatic simply because the defendant asserts that there was coercion. *Id*. at 286 (noting that the "mere accusation of coercion" does not create a conflict of interest); *Armienti*, 234 F.3d at 823 (requiring the court to "inquir[e]" into possible conflicts of interest, and relieve counsel, or obtain a waiver, only where that inquiry reveals an actual conflict).

The district court did not abuse its discretion in failing to appoint substitute counsel before or after Rivernider submitted his pro se motion. Bergenn initially moved to withdraw as counsel on December 10, 2013. That motion was denied as it did not include any justification for the withdrawal. Two days later, Bergenn requested that the court permit Rivernider to file a pro se motion seeking to withdraw his plea as Bergenn did not believe there was a non-frivolous basis for making such a motion. Although Bergenn did not specify the precise ground for the pro se motion, Bergenn stated that Rivernider "has reported to counsel that he has read voluminous other decided cases within which there is language that states things such as a requirement that to be guilty

of a crime a defendant must be found to have intended to cause harm." G.A 591.

Nothing in either motion indicated that attorney coercion was a potential basis for Rivernider's plea withdrawal motion.

The district court subsequently permitted Rivernider to file a pro se motion, which Rivernider filed on December 16, 2013. In that submission – which contains fifty-three pages of written text and additional pages of exhibits – Rivernider makes only two brief references to any potential coercion: first, that Rivernider "spent 2.5 days with Mr. Bergenn being told that he had a serious deficiency, brain damage, and that he had to plead guilty because of it," G.A. 642, and second, that Bergenn refused to go back to trial after learning of Rivernider's executive functioning deficiencies.[6] Rivernider also argued his motion before the court on December 18. Rivernider spoke at some length,[7] but made no reference to Bergenn's alleged misconduct, arguing instead that he lacked the mens rea necessary to have committed wire fraud and that the evidence presented to the grand jury was fraudulent. The district court denied Rivernider's motion to withdraw the guilty plea, noting that although it was concerned about the

[6] Those two passages appear on the forty-sixth and forty-eighth pages of Rivernider's motion.

[7] The transcript of Rivernider's comments to the court spans twenty pages.

allegations against Bergenn, they were insufficient to warrant any relief as they were conclusory and contrary to Rivernider's sworn testimony.

The district court did not err in failing to appoint substitute counsel to assist Rivernider in making a motion to withdraw his plea at any point in that process. First, the district court did not err in denying Bergenn's initial motion to withdraw, which contained no basis for granting the motion. Second, there can be no error in failing to appoint substitute counsel *before* Rivernider filed his pro se motion as there was no indication in any of the previous filings that attorney misconduct was a possible basis for the projected motion. Third, the district court did not err in allowing Rivernider to file his motion pro se, as it gave Rivernider an opportunity to set forth any meritorious grounds for withdrawing his plea.

Finally, the district court did not err in failing to appoint substitute counsel after receiving the pro se motion and hearing Rivernider speak in support of that motion. Although a defendant need not prove – without the benefit of counsel – that he was actually coerced into pleading guilty in order to obtain substitute counsel for the purpose of making a motion to withdraw a guilty plea, where the defendant makes only conclusory allegations of coercion, the district court may

33

satisfy its inquiry obligation without conducting an evidentiary hearing or appointing new counsel, so long as the district court adequately evaluates whether "the facts as alleged support a finding of a conflict." *See Davis*, 239 F.3d at 287. Rivernider's passing references to Bergenn's conduct, buried within a lengthy and otherwise irrelevant submission, contain no specific factual allegations. Such conclusory assertions of coercion, standing alone, do not suffice to allege an actual conflict of interest. Moreover, the district court's comments on the record make it clear that the court did not ignore the possibility of coercion, but determined – in light of the record available at the time – that the allegations were not plausible. Under these circumstances, the district court did not err in declining to appoint new counsel.

Accordingly, we reject Rivernider's challenges to his convictions based on the inadequacy of his plea although, as discussed above, that conclusion is without prejudice to any § 2255 motion Rivernider may make on the basis of ineffective assistance of counsel.

## II.    Sentencing Challenges

Both Rivernider and Ponte challenge their sentences. Rivernider challenges his sentence only as substantively unreasonable. Ponte argues that his

sentence is both procedurally unreasonable, as the district court erroneously applied a number of sentencing enhancements and failed to apply appropriate reductions, and substantively unreasonable.

### A.    Rivernider

We review the substantive reasonableness of a district court's sentence for abuse of discretion, and we "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007).  We set aside a district court's sentence as substantively unreasonable only if the sentence "cannot be located within the range of permissible decisions." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (internal quotation marks omitted).  Although "[w]e have previously declined to adopt a presumption of reasonableness for sentences that fall within the guidelines range," opting instead "for a more flexible approach that allows consideration of the facts of an individual case," *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013), it is "difficult to find that a below-Guidelines sentence is [substantively] unreasonable," *United States v. Perez-Frias*, 636 F.3d 39, 43 (2d Cir. 2011).

35

The challenged 144-month sentence, which is substantially lower than the 324 to 405 month Guidelines range, easily falls within the range of permissible decisions available to the district court.[8]   In determining Rivernider's sentence, the district court observed that the loss amount – over $20 million – overstated the seriousness of the offense, as Rivernider was not a predatory fraudster, had engaged in significant investment activity, and had himself been defrauded. Additionally, the court noted that, although Rivernider misled clients about the

---

[8] Rivernider's Guidelines range, which is not challenged here, is based on a total offense level of forty-one, consisting of: a base offense level of seven, *see* U.S.S.G. § 2B1.1(a)(1), a twenty-two level enhancement based on loss amount, *see id.* § 2B1.1(b)(1)(L), a four-level adjustment for the number of victims, *see id.* § 2B1.1(b)(2)(B) (as of 2013), a two-level adjustment for the use of sophisticated means, *see id.* § 2B1.1(b)(10)(C), a two-level adjustment because more than $1,000,000 was obtained from financial institutions, *see id.* § 2B1.1(b)(16)(A) and a four-level role adjustment, *see id.* § 3B1.1(a).  His criminal history category was I.

At the time of Rivernider's sentence, U.S.S.G. § 2B1.1(b)(2)(B) provided for a four-level increase when the crime involved between 50 and 250 victims.  The Sentencing Commission amended U.S.S.G. § 2B1.1(b)(2)(B) in 2015 to provide a four-level increase where the crime resulted in "substantial financial harm" to five or more victims, replacing the previous version which provided for a four-level increase based solely on number of victims.  Sentencing Guidelines for United States Courts, 80 Fed. Reg. 25,782, 25,790-91 (May 5, 2015).  That amendment, which was not made retroactive, does not apply on direct review.  *See United States v. Colon*, 961 F.2d 41, 44-46 (2d Cir. 1992) (explaining that amendments to the Guidelines that constitute a substantive change to, rather than a clarification of, a Guideline do not apply on direct review).  Accordingly, we analyze the defendants' sentencing challenges under the Guidelines provisions applicable at the time of their sentencing.

36

risk, he did not steal from them outright, had not led a lavish lifestyle, and was a first-time offender. The district court determined that a substantial sentence was nonetheless necessary because of the severity of Rivernider's conduct and the resulting devastation caused to his former clients.

Rivernider argues that his sentence is substantively unreasonable because he was a first-time offender, has strong family ties, did not begin the NMB program with the intent to steal money, and engaged in significant investment activity, and because a short sentence is sufficient to deter white collar crime. We disagree. The district court considered all of these arguments in sentencing Rivernider to a below-Guidelines term of imprisonment, and acted well within its discretion in determining Rivernider's sentence.

## B. Ponte

"A district court commits procedural error where it makes a mistake in its Guidelines calculation, does not consider the § 3553(a) factors, or rests its sentence on a clearly erroneous finding of fact." *United States v. Hsu*, 669 F.3d 112, 120 (2d Cir. 2012) (alterations and internal quotation marks omitted); *see also Gall*, 552 U.S. at 51. We review the district court's legal determinations in applying the Guidelines de novo. *See Hsu*, 669 F.3d at 120.

Ponte's total offense level was thirty-seven, consisting of: a base offense level of seven, *see* U.S.S.G. § 2B1.1(a)(1), a twenty-two level enhancement based on loss amount, *see id.* § 2B1.1(b)(1)(L), a four-level adjustment for the number of victims, *see id.* § 2B1.1(b)(2)(B) (as of 2013),[9] a two-level adjustment for the use of sophisticated means, *see id.* § 2B1.1(b)(10)(c), and a two-level adjustment for abuse of position of trust, *see id.* § 3B1.3. Ponte's challenges the application of all of those enhancements, and also argues that the district court erred in not applying a minor-role or acceptance-of-responsibility reduction. He further argues that his sentence was substantively unreasonable.

### 1. Procedural Reasonableness

#### a. Loss Amount

"Loss for purposes of the fraud guideline . . . is defined as 'the greater of actual loss or intended loss.'" *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 103 (2d Cir. 2014), quoting U.S.S.G. § 2B1.1 cmt. n.3(A). A district court is not required to calculate loss with "absolute precision," but need only by a preponderance of the evidence "make 'a reasonable estimate of the loss' given the

---

[9] As discussed in note 8, the Sentencing Commission amended § 2B1.1(b)(2)(B) after Ponte's sentencing. The amendment does not apply on direct review.

available information."  *See United States v. Coppola*, 671 F.3d 220, 250 (2d Cir. 2012), quoting U.S.S.G. § 2B1.1 cmt. n.3(C).  "Nevertheless, a court of appeals must determine whether the trial court's method of calculating the amount of loss was legally acceptable."  *United States v. Rutkoske*, 506 F.3d 170, 178 (2d. Cir. 2007) (alteration and internal quotation marks omitted).

Ponte argues that the district court erred in finding that the government had proven by a preponderance of the evidence that the loan applications for each of the 104 properties purchased through Cut Above Ventures contained a material misrepresentation.  In order to reach this conclusion, the district court held a loss amount hearing.  At the hearing, the government introduced (1) the testimony of Rivernider's co-conspirator, Tosha Wade, who testified that the incentive program was not disclosed to lenders and also described the common steps taken to commit mortgage fraud; (2) an email between Wade and a buyer in which Wade explained that the lender should not be told about the incentive program; (3) documents from Rivernider's computer listing all 104 properties with the general notation "Property List"; and (4) testimony from FBI Special Agent Stephen West.  West testified that (1) all of the documents relating to the 104 properties were found in one place; (2) he had not seen any document that

would suggest that any of the 104 mortgages were not obtained through the Cut Above Ventures incentive program; (3) he had not found any documents disclosing the incentive plan to lenders; and (4) the properties on the spreadsheet matched the properties the government identified as fraudulent.

On cross-examination, West conceded that he did not know which specific misrepresentations were made with respect to individual loans, and that he did not have access to internal communications between lenders that could potentially show lenders' awareness of the incentive program. West also admitted that he had not looked specifically at the loan documentation for all 104 properties, and, when questioned about two specific transactions, was unable to provide any details without checking the underlying documentation. He clarified that it was his belief that if he checked the documentation for each loan, he would find that each transaction was tainted. Following the hearing, the government filed a supplemental submission describing the two real estate transactions that West had been questioned about, and identifying the misrepresentations contained in those loan documents.

The district court did not commit clear error in determining that the foregoing evidence was sufficient to establish, by a preponderance of the

evidence, that all 104 properties purchased through Cut Above Ventures were tainted by fraud. Although the government did not identify which misrepresentations were made with respect to each individual loan, the testimony of West – which the district court found credible – combined with Wade's testimony and other documentary evidence, are sufficient to establish that it was more likely than not that all of the 104 loan applications processed by Cut Above Ventures contained material misrepresentations.

### b. Other Sentencing Challenges

Ponte also challenges the district court's application of enhancements for abuse of a position of trust, use of sophisticated means, and number of victims, as well as the court's denial of acceptance-of-responsibility and minor role reductions. Ponte's arguments largely revolve around the characterization of his role in the fraud as that of a minor player who lacked knowledge of the overarching scheme; therefore, he argues, enhancements for *Rivernider's* use of sophisticated means, number of victims, and abuse of a position of trust were inappropriate.

As Ponte largely does not challenge the application of these enhancements to the schemes as a whole, only the application to himself based on his role in the

41

offense, we address here only the district court's factual finding that Ponte was "more a partner than a pawn," G.A. 880, in both schemes. The district court did not err in rejecting Ponte's self-serving description of his role in the offense. In his statement of offense conduct, Ponte admitted to soliciting money for the NMB program using material misrepresentations and omissions. With respect to the real estate scheme, Ponte admitted to participating in a real estate conspiracy that deceived lenders and personally making material misrepresentations and omissions to borrowers. Moreover, as the district court observed, emails between Ponte and Rivernider showed that Ponte acted as Rivernider's partner, regardless of the formal business arrangement. Based on Ponte's own admission of offense conduct, and other documentary evidence, the district court did not err in rejecting Ponte's characterization of himself as a mere salesperson who lacked knowledge of the overall scheme.

Ponte additionally argues that the abuse-of-trust enhancement was in error because he had no managerial or professional discretion with respect to the clients' funds. U.S.S.G. § 3B1.3 provides for a two-level enhancement "[i]f the defendant abused a position of public or private trust, . . . in a manner that significantly facilitated the commission or concealment of the offense." The term

"public or private trust" refers to a position characterized by "professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)" and is consequently subject to reduced supervision.  U.S.S.G. § 3B1.3, cmt. n.1.  "Whether a position is one of 'trust' within the meaning of § 3B1.3 is to be viewed from the perspective of the offense victims . . . ."  *United States v. Wright*, 160 F.3d 905, 910 (2d Cir. 1998).

Ponte's argument the he lacked discretionary authority in either scheme fails.  As the district court found, Ponte functioned essentially as an investment advisor for a number of victims.  For example, Ponte convinced some victims to take out home equity loans to increase investments in the NMB program, and recruited investors for the real estate scheme from his NMB clients with whom he had already established a relationship.  Ponte was not directly supervised by Rivernider; rather, he exercised significant discretion in recruiting victims.  In light of the foregoing evidence, the district court did not err in finding that, from the perspective of the victims, Ponte occupied a position of trust.

Ponte also argues that the district court erred in failing to grant an acceptance-of-responsibility reduction.  "Whether a defendant has carried his burden to demonstrate acceptance of responsibility is a factual question on which

43

we defer to the district court unless its refusal to accord such consideration is without foundation." *United States v. Broxmeyer*, 699 F.3d 265, 284 (2d Cir. 2012) (internal quotation marks omitted). As Ponte did not plead guilty until several weeks into the trial, and contradicted his statement of offense conduct at sentencing, there was a more than adequate foundation for denying an acceptance of responsibility reduction.

### 2. Substantive Reasonableness

Ponte argues that his sentence was substantively unreasonable because the district court imposed a sentence greater than necessary to achieve the goals of 18 U.S.C. § 3553(a). That argument is premised on the district court's consultation of a draft of an American Bar Association report, which set forth proposed alternative guidelines for economic crimes, and would have yielded a guidelines range below 90 months had they actually been in effect. *See* American Bar Association, A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on The Reform of Federal Sentencing for Economic Crimes (2014), www.americanbar.org/content/dam/aba/uncategorized/criminal_justice/economic_crimes.authcheckdam.pdf.

Ponte's argument lacks any basis in law.  The district court considered – among other factors – the rationale of the ABA report in concluding that the Guidelines loss amount calculation overstated the seriousness of Ponte's offense.  However, such consideration does not require the court to follow the recommendations set forth in that report.  The district court was (to understate the case) no more bound by a hypothetical set of guidelines issued by proponents of changes in the law than it was by the actual Guidelines promulgated by the Sentencing Commission.   Accordingly, Ponte's below-Guidelines sentence is easily "located within the range of permissible decisions."  *Cavera*, 550 F.3d at 189 (internal quotation marks omitted).

III.    **The Restitution Order**

Both defendants challenge the $22,140,765.99 restitution order entered by the district court.  We generally review a district court's order of restitution "for abuse of discretion," reversing its ruling only if it "rests on an error of law, a clearly erroneous finding of fact, or otherwise cannot be located within the range of permissible decisions."  *United States v. Boccagna*, 450 F.3d 107, 113 (2d Cir. 2006) (internal quotation marks omitted).  When a defendant's challenge to a restitution order raises an issue of law, we review that challenge de novo.  *United States v. Reifler*, 446 F.3d 65, 120 (2d Cir. 2006).

45

The Mandatory Victim Restitution Act ("MVRA") requires sentencing courts to "order . . . that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). "Victim" is defined, in part, as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." *Id*. § 3663A(a)(2). "In restricting its definition of 'victim' to persons proximately harmed by the defendant's acts, the MVRA aims to limit restitution to those harms that have a sufficiently close connection to the conduct at issue," and thus "§ 3663A(a)(2)'s definition of 'victim' governs the calculation of the reimbursable loss itself." *United States v. Thompson*, 792 F.3d 273, 277 (2d Cir. 2015) (alterations and internal quotation marks omitted). Restitution is thus limited to "actual" losses, though the calculation of these losses need not be "mathematically precise." *United States v. Gushlak*, 728 F.3d 184, 195 (2d Cir. 2013) (internal quotation marks omitted). "[A] reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently incalculable." *Id.* at 196 (internal quotation marks omitted).

Ponte argues, and Rivernider joins in his argument, that the restitution order impermissibly charged the defendants interest, and did not reflect actual losses to lenders. As these contentions were not raised before the district court,

46

we review only for plain error.[10]

## A.    Interest

Ponte argues that the district court improperly included interest in the restitution calculation with respect to the real estate scheme because the mortgage payments Cut Above Ventures made during the course of the scheme largely applied (under the terms of the mortgage) to interest rather than the principal.   Although "loss" is limited to the unpaid principal, minus the value of the collateral, and may not include interest, *see United States v. Turk*, 626 F.3d 743, 749 (2d Cir. 2010) (holding that the victims' loss is limited to unpaid principal);

---

[10] Rivernider additionally argues that the methodology used to calculate restitution for the NMB program was unreliable, as it was based on incomplete financial records.  However, the restitution calculation, which only considered losses to victims in the last ten months of the NMB program, was a "reasonable approximation of losses," *Gulshak*, 728 F.3d at 196, as it included only victims who were virtually certain to have lost money and credited Rivernider for all outgoing payments that were clearly associated with the NMB fraud.  That a small number of outgoing payments could not be identified as part of the NMB scheme does not render that methodology "speculative."

We further reject Rivernider's argument that the lender-victims of the real estate scheme were not entitled to restitution as they participated in the fraud. There is no evidence in the record that the lenders knew of the fraudulent scheme or would have participated in the scheme had they known.

Finally, for the same reasons that we rejected Ponte's sentencing challenge, we also reject the defendants' argument that there was insufficient evidence that all 104 properties purchased through Cut Above Ventures were tainted by fraud.

U.S.S.G. § 2B1.1 cmt. n.3(D)(i) (excluding interest from loss calculation) , the restitution order does not require the defendants to pay anything else. Any interest previously paid by the defendants was charged by the victim-lenders while the scheme was ongoing – not by the district court in the restitution order. Therefore, Ponte's arguments that the restitution order impermissibly charged the defendants interest fails.

### B.     Actual Losses to Downstream Mortgage Purchasers

Ponte additionally argues that the restitution calculation for the real estate scheme does not reflect the actual losses because some of the mortgage loans involved in the scheme were sold prior to foreclosure at an unknown price. In calculating losses to downstream purchasers of the fraudulent mortgage loans, the district court relied on the unpaid principal rather than the amount downstream lenders actually paid for the mortgage loan. Thus, downstream lenders who purchased mortgage loans for *less* than the value of the unpaid principal would receive more money than was actually lost under the restitution order. *See United States v. Howard*, 784 F.3d 745, 750-51 (10th Cir. 2015) (holding that a restitution order that did not account for the amount actually paid by a downstream loan purchaser could result in a impermissible windfall to the purchaser).

48

Neither defendant raised this argument below,[11] and we accordingly review for plain error, which requires that the error be "clear or obvious, rather than subject to reasonable dispute." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (internal quotation marks omitted). Although we are sympathetic to the defendants' argument, any error on this point was not "clear or obvious" as it requires a complex understanding of the mortgage sales market as it existed from 2006 to 2008. Nothing in the record permits us to assess the likelihood that all or any of the loans would have been sold at a discount, at face value, or at a premium, and we cannot fault the district court for failure to consider those speculative possibilities *sua sponte*.

Accordingly, we identify no reversible error in the district court's restitution order.

## CONCLUSION

For the foregoing reasons, the judgments of the district court are AFFIRMED.

---

[11] Rivernider did point out to the district court that loans could have been sold prior to foreclosure. However, Rivernider used that fact to bolster his argument that the lenders were knowing participants in the fraud; he did not argue, as Ponte does on appeal, that the loans could have been sold for less than the unpaid principal.