17-2018(L)
*U.S. v. Albarran and Vasquez*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2018

(Submitted: August 29, 2018    Decided: November 15, 2019)

Docket No. 17-2018, 17-2097

UNITED STATES OF AMERICA,

*Appellee*,

–v.–

SAMUEL ALBARRAN, WILSON VASQUEZ,

*Defendants-Appellants,*

FRANCISCO RODRIGUEZ, VICTOR RIVERA, TODD BEILBY, NELSON COLON,
ALFREDO COLLAZO, MIGUEL SOTO, FRANK MROWKA, ELIO DELIMA,
EMMANUEL FLEMING, JOSE LUGO, ANTHONY VELEZ, JOSE ALBARRAN, LUIS
ALBARRAN, VICTOR AZEVEDO, ROBERTO TORRES,

*Defendants.*[1]

[1] The Clerk of Court is directed to amend the caption to conform to the above.

B e f o r e :

LYNCH, CARNEY, AND DRONEY, *Circuit Judges*.

———————

In 2016, in related prosecutions, Defendants-Appellants Samuel Albarran and Wilson Vasquez each pleaded guilty in the United States District Court for the District of Connecticut (Bolden, *J.*) to charges of conspiracy to distribute heroin. Albarran also pleaded guilty to possessing a firearm in furtherance of a drug trafficking crime. On appeal, Vasquez urges that his sentence of 151 months' imprisonment is substantively unreasonable. Albarran in turn challenges the District Court's denial of his motion to withdraw his guilty plea. For the reasons set forth further below, neither challenge succeeds. We conclude that the District Court acted within its discretion when it sentenced Vasquez primarily to 151 months in prison. As to Albarran, we decide that the District Court did not abuse its discretion when it denied Albarran's motion to withdraw his guilty plea. Accordingly, we AFFIRM the District Court's June 29, 2017 judgment as to Albarran and June 30, 2017 judgment as to Vasquez.

AFFIRMED.

———————

> Daniel M. Perez, Law Offices of Daniel M. Perez, Newton, NJ, *for Wilson Vasquez*.
>
> Scott F. Gleason, Gleason Law Offices, P.C., Haverhill, MA, *for Samuel Albarran*.
>
> H. Gordon Hall (Marc H. Silverman, *on the brief*), *for* John H. Durham, United States Attorney for the District of Connecticut, New Haven, CT.

———————

CARNEY, *Circuit Judge*:

In 2016, in related prosecutions, Defendants-Appellants Samuel Albarran and Wilson Vasquez each pleaded guilty in the United States District Court for the District

2

of Connecticut (Bolden, *Judge*) to conspiracy to distribute heroin. Vasquez pleaded guilty to violating 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(i), and 846. Albarran pleaded guilty to violating 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. Albarran also pleaded guilty to possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) and (c)(2). On appeal, Vasquez urges that his sentence primarily of 151 months' imprisonment is substantively unreasonable; Albarran in turn challenges the District Court's denial of his motion to withdraw his guilty plea.

For the reasons set forth below, neither challenge succeeds. Accordingly, we AFFIRM the District Court's June 29, 2017 judgment as to Albarran and June 30, 2017 judgment as to Vasquez.

## BACKGROUND[2]

In 2014, the Drug Enforcement Administration ("DEA") began investigating a substantial heroin trafficking organization based in Fair Haven, a neighborhood within the New Haven, Connecticut, city limits. Through in-person surveillance, the warranted interception of thousands of telephone conversations, and "controlled buys"—that is, drug purchases effected by undercover agents—the DEA's work revealed a sprawling drug distribution scheme in which Wilson Vasquez was a principal and his half-

---

[2] We draw this factual statement from the Probation Office's Presentence Reports ("PSR") as to Vasquez and Albarran and the transcripts of the relevant hearings conducted by the District Court. We also rely on documents submitted to the District Court by Albarran and the government in connection with Albarran's motion to withdraw his guilty plea. These include the report of investigation prepared by the Drug Enforcement Administration following the execution of a search warrant at 501 Blatchley Avenue and a report prepared by a private investigation firm retained by Albarran and working with his first attorney, Jeremiah Donovan (as will be discussed). Disputed aspects are flagged in the text where relevant.

brother, Samuel Albarran, was a participant. The investigation led to the indictment in 2015 of seventeen individuals, including Vasquez and Albarran.

## I.    Wilson Vasquez

Evidence gathered by the DEA in 2014 and 2015 showed that, during this period, Vasquez regularly acquired heroin in bulk and arranged for his associates to package and redistribute the drug. Every few weeks, Vasquez provided his workers with as much as 500 grams of heroin. Those individuals would then divide the bulk into 25-gram quantities and place the portions into bags, some of which were stamped with a logo associated with Vasquez. Vasquez, who ran these bagging sessions out of his own residence and at other locations in Fair Haven, then retrieved the bagged drugs from his workers and distributed them to his street-level operatives for sale. One of his workers estimated later that he alone had bagged approximately five kilograms of heroin for Vasquez over the course of a year. It also appeared that, during this time, at least one individual using heroin obtained from Vasquez's operation died from an overdose.[3]

Vasquez was arrested on July 15, 2015. A little over one year later, having reached an agreement with the government, he pleaded guilty to conspiracy to possess with intent to distribute 100 grams or more of a mixture containing heroin, under 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(i), 846. As part of this plea agreement, the government made a Guidelines sentencing recommendation of 121 to 151 months'

---

[3] Although the fact of this death and its relationship to heroin sold by Vasquez's operation appear to be undisputed, and the District Court was aware of and commented on the death, the government did not urge that Vasquez's Guidelines range be increased to reflect the death.

4

incarceration, calculated based on a total adjusted offense level of 31 and criminal history category of II.[4]

Judge Bolden sentenced Vasquez in June 2017. Before pronouncing the sentence, the judge reviewed aloud the factors that it considered in reaching its decision. The court emphasized the gravity of Vasquez's conduct: for at least one year, he had led a drug trafficking conspiracy that involved sixteen other participants and that harmed "countless victims." Vasquez App'x 121. The judge pointed to the death of one young person following the use of heroin distributed by Vasquez's ring as an example of the gravity of the offense. Offsetting these aggravating circumstances, at least in part, the court recognized Vasquez's relatively limited criminal history (albeit one involving drugs); Vasquez's own substance abuse; and the physical abuse Vasquez had suffered as a child at the hands of his stepfather. Aiming to avoid unwarranted sentencing disparities among Vasquez's co-defendants, the court also cited as benchmarks the sentences it had imposed on them.

In the end, according significant weight to Vasquez's leadership role and the tremendous toll that heroin addiction was taking on the Fair Haven community, Judge Bolden imposed a sentence on Vasquez of 151 months' incarceration, at the top of the applicable Guidelines range.

---

[4] For the purposes of the Guidelines sentencing recommendation, the government and Vasquez stipulated that between one and three kilograms of heroin were attributable to Vasquez. This resulted in a base offense level of 30. *See* U.S.S.G. § 2D1.1(c)(5). Under U.S.S.G. § 3B1.1(a), Vasquez's leadership role warranted a four-level enhancement above the base level. The increase was partially offset, however, by a three-level reduction under U.S.S.G. § 3E1.1, reflecting his acceptance of responsibility. Vasquez's adjusted offense level was therefore 31. His sentence was also subject to the 60-month minimum that was dictated by the quantity of drugs involved. *See* 21 U.S.C. § 841(b)(1)(B)(i).

**II.**     **Samuel Albarran**

A.     The investigation

Phone calls lawfully intercepted by the DEA from April 24 through 26, 2015, revealed that Vasquez's half-brother, Samuel Albarran, was involved in Vasquez's heroin distribution conspiracy. During several recorded calls, the two men discussed the price of heroin, and Albarran agreed to acquire drugs for Vasquez. Based largely on these intercepted conversations, on July 9, 2015, a grand jury indicted Albarran for conspiracy to distribute and to possess with intent to distribute heroin.

During the week of July 6, 2015, agents surveilling Albarran saw him in the immediate vicinity of 501 Blatchley Avenue, a three-unit residential building in Fair Haven. About one week after Albarran's indictment, on July 15, law enforcement officers attempted to execute a warrant for Albarran's arrest at the first-floor apartment of 501 Blatchley, an apartment leased by one of Albarran's brothers. After entering the apartment to arrest him, the agents realized that Albarran was not present, but, while conducting a protective sweep of the unit, the officers saw, in plain view, substances they suspected to be heroin and cocaine; a money counter; and four 50-gallon drum-like containers.

Some officers later returned to the residence with a search warrant in hand, and proceeded to search the first-floor apartment and to examine the 50-gallon drums. They uncovered substantial additional evidence of criminal activity related to the drug trade: they found cocaine, heroin, and marijuana; three scales; drug packaging materials; a kilogram press; six 9mm bullets (these were found in an unmarked plastic bottle on the kitchen counter); drug ledger sheets; cash in the amount of roughly $21,000; and two firearms. In the apartment's bedroom, the officers also found a Capitol One credit card

6

bill bearing Albarran's name and addressed to him at a location other than 501 Blatchley.

During the search, an officer spoke to Aida Torrez, a third-floor tenant at 501 Blatchley. Torrez informed the officer that "she knew the resident [of the first-floor unit] as Sam." Gov't App'x 182. Upon being shown Albarran's photograph, she identified him "as the sole resident of the first[-]floor apartment." *Id.* Torrez recalled that she had last seen Albarran in the rear lot of the house on the preceding day at about 5 pm. Torrez said further that she often saw Albarran leaving the first-floor unit around 7 am, when she was returning home after work.

In February 2016, about six months after the return of the indictment and search of the apartment, Albarran was arrested. After his arrest, a pretrial service officer who was preparing Albarran's bail report asked Albarran for his "permanent address," and Albarran responded, "501 Blatchley." Albarran App'x 147. (He later disavowed this statement).

Based on the drugs and firearms recovered from 501 Blatchley, a grand jury returned a superseding indictment charging him with three offenses in addition to the charge made in July 2015 for conspiracy to distribute and to possess with intent to distribute 100 grams or more of heroin under 21 U.S.C. § 841(a)(l) and (b)(l)(B)(i) (Count 1). The three additional offenses were: possession with intent to distribute heroin and cocaine, under 21 U.S.C. § 84l(a)(l) and (b)(l)(C) (Count 6); unlawful possession of a firearm by a convicted felon, under 18 U.S.C. §§ 922(g) and 924(a)(2) (Count 7); and possession of a firearm in furtherance of a drug trafficking crime, under 18 U.S.C. § 924(c)(1)(A)(i) and (c)(2) (Count 8). Count 8 cited the two firearms recovered from 501 Blatchley, identifying each by make and serial number.

7

In August 2016, the government offered Albarran a plea agreement, as described below. He decided instead to proceed to trial.

B.    *Frye* hearing

On September 14, 2016, about one week before jury selection in Albarran's trial was slated to begin, Magistrate Judge Garfinkel conducted a *Frye* hearing to ensure that Albarran fully understood the terms of the plea agreement that he was rejecting.[5] At the hearing, the government reviewed the proposed agreement's terms, identified the elements of each offense to which Albarran would plead guilty, listed the rights Albarran would forfeit by entering a guilty plea, and described the Sentencing Guidelines' application to his convictions. Thus, the government explained that, under the proposed agreement, Albarran would enter two guilty pleas: one on a lesser included offense of Count 1 (the drug conspiracy);[6] and the second, on Count 8 (possession of a firearm in furtherance of a drug trafficking crime). For its part, the government would seek to dismiss both Count 6 (possession of heroin and cocaine with intent to distribute) and Count 7 (felon in possession of a firearm). Each of Counts 1 and 8 carried a five-year mandatory minimum sentence. But by pleading guilty to the

---

[5] In *Missouri v. Frye*, the Supreme Court held that "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Missouri v. Frye*, 566 U.S. 134, 145 (2012). In a *Frye* hearing, the court strives to ensure that a full and accurate communication on the subject has occurred.

[6] The Superseding Indictment charged Albarran with conspiring to distribute and to possess with intent to distribute 100 grams or more of a mixture and substance containing a detectable amount of heroin. *See* 21 U.S.C. § 841(b)(1)(B)(i). Under the terms of the plea agreement, however, Albarran would plead guilty to conspiracy to possess with intent to distribute "an unspecified quantity" of a mixture and substance containing heroin. Gov't App'x 39; *see* 21 U.S.C. § 841(b)(1)(C).

proposed lesser included offense of Count 1, Albarran would avoid exposure to the aggregate ten-year mandatory minimum sentence on Counts 1 and 8 that he could face were he to proceed to trial.

Discussing in Albarran's presence the evidence that the parties would present at trial, each side candidly acknowledged the strengths and weaknesses of its case. Attorney Jeremiah Donovan, representing Albarran, admitted that he was less confident in Albarran's likely success at trial on the firearms count than he had been earlier. In particular, while he had at first assessed the evidence tying Albarran to 501 Blatchley as "questionable," he considered Albarran's statement to a pretrial service officer, made after his arrest, that his permanent address was 501 Blatchley to be "devastating" to Albarran's defense.[7] Gov't App'x 20-21. For its part, the government conceded that federal agents never saw Albarran "going into and coming out of" 501 Blatchley. *Id.* at 29. The government nevertheless considered its case to be strong because, to achieve a conviction on the firearm count, it did not need to prove that Albarran "actually resided" at 501 Blatchley; it could instead establish his constructive possession of the two firearms found inside the apartment, knowledge of which Albarran never denied. *Id.*

C.    Change-of-plea hearing

One day after the *Frye* hearing, Albarran reversed course and signed the proffered plea agreement. In it, he acknowledged that "he possessed the [two identified

---

[7] Earlier, Attorney Donovan unsuccessfully sought to suppress that statement, arguing that it was made involuntarily. The District Court denied the motion, observing that an officer need not give *Miranda* warnings to an individual before asking routine booking questions. Some time thereafter, the government offered the plea agreement described in the text.

firearms] in violation of 18 U.S.C. § 924(c)" and would "forfeit his interest" in those firearms, a Cobra .380 handgun and a Glock 9mm handgun and related ammunition. *Id.* at 39, 41.

Judge Garfinkel duly convened a change-of-plea hearing on September 15. Albarran orally admitted during the hearing that he conspired to distribute a substance containing heroin and that he possessed the two firearms found at 501 Blatchley in furtherance of a drug trafficking crime. During the proceedings, Attorney Donovan confirmed that he had reviewed "every aspect" of the plea agreement with Albarran; he described Albarran as "more involved in this decision than practically any defendant that [he's] ever represented." *Id.* at 57-58. Judge Garfinkel once again instructed the government to review the plea agreement aloud and methodically for Albarran, explaining the elements of each count and describing the related potential penalties. The government also laid out the evidence it would present to the jury to prove each element of the crimes.

In a conscientious colloquy, Judge Garfinkel highlighted that the notion of "constructive possession," integral to the firearms count, was not especially intuitive. *Id.* at 85. The judge confirmed with Attorney Donovan that he had separately discussed the concept with Albarran. In further comments, Attorney Donovan then contrasted constructive possession with actual possession, explaining as follows:

> [T]here's actual possession. The government's never claimed that [Albarran] had actual possession or doesn't have any evidence of any actual possession. And there's constructive possession. And I've explained that that's . . . if you have the intention and the ability to exercise dominion and control over something, even though it's not on you, not in your car, it's not within 100 yards of where you are, nevertheless you

10

possess it.

> There's a TV at my house right now that . . . I'm 45 miles away from, but I do possess it because I have the intent and the ability to exercise dominion and control over it.

*Id.* at 86.

Judge Garfinkel then requested that Attorney Donovan ask Albarran "a few follow-up questions just to make sure, yet one more time, that we covered each of those essential elements." *Id.* at 87. In that further dialogue on the record, Albarran confirmed that his half-brother, Vasquez, ran a drug operation and that he (Albarran) had become involved and participated in it. Albarran affirmed that he understood that he was charged with constructive possession of the two firearms found at 501 Blatchley. He stated that he did not reside at 501 Blatchley, but that his mother lived on the second floor. Judge Garfinkel then returned to the concept of constructive possession, asking Albarran: "So you did have the ability to exercise dominion and control over things that were in that apartment, right? You have the power [to] do that if you wanted to?" Albarran, still under oath, responded, "Yes." *Id.* at 88-89. Judge Garfinkel then asked, more generally, whether Albarran understood the plea agreement and was agreeing to plead guilty voluntarily. Albarran again responded, "Yes." *Id.* at 91.

At the close of the hearing, Albarran orally pleaded guilty to the lesser-included offense of Count 1 (drug conspiracy), and to Count 8 (the firearms count), charged in the superseding indictment.

11

D.      Motion to withdraw guilty plea

In January 2017, almost four months after entering his guilty plea at the hearing just described, and after retaining new defense counsel, Albarran moved to withdraw his guilty pleas. The record made in connection with that motion shows the following.

Before entering into the plea agreement, Albarran pressed Attorney Donovan to retain an investigator for help in demonstrating that Albarran did not reside at 501 Blatchley. Attorney Donovan tried to hire a certain investigator whom he trusted, but was unable to do so. Albarran appears to have then himself arranged for another investigative firm to take on the task, and that firm coordinated with Attorney Donovan. On September 23, 2016, one week after Albarran entered his guilty plea, the firm issued its written report.

The report set forth two principal findings. First, it described evidence showing that, from at latest mid-2014 until his arrest in February 2016, Albarran "resided" in an apartment leased by his girlfriend at 176 Fitch Street, in a New Haven neighborhood several miles from Fair Haven. Albarran App'x 25, 27. The landlord of the Fitch Street apartment stated to the investigators that, to the best of his knowledge, Fitch Street was Albarran's "primary residence." *Id.* at 25. He had no documents supporting his statement, the report noted.

Second, the report detailed a phone conversation that these investigators had with Aida Torrez, the third-floor resident of 501 Blatchley, who had previously identified Albarran as that building's first-floor resident. In that conversation, she reportedly denied both knowing Albarran and telling officers that he "resided" in the first-floor apartment at 501 Blatchley. *Id.* at 25-26. When asked if she ever provided a statement to law enforcement, she reportedly answered that she was "uncertain." *Id.* at

12

26. She declared that she had "no desire to be involved" in the case, and related that she had decamped from 501 Blatchley because, while there, she was being called a "snitch." *Id.*[8]

After he received the report in September, Albarran filed a series of pro se motions seeking various forms of relief. These included a motion to proceed pro se. Upon this development, Attorney Donovan withdrew, and Albarran then retained Attorney Scott Gleason. In January 2017, Attorney Gleason sought leave for Albarran to withdraw his guilty plea in light of the "information" contained in the investigatory report, which he described as "relevant [and] exculpatory." Dist. Ct. Dkt. No. 643-1 ¶ 9. He asserted that the report undermined the factual basis for Albarran's plea by revealing (as he characterized it) that Albarran had "no association" with the first-floor unit at 501 Blatchley. *Id.* at ¶ 23. In support of the motion, he attached a sworn declaration from Albarran asserting that, "from the beginning of this matter," he "maintained to Attorney Donovan that [he is] innocent of all charges." Albarran App'x 146. He pleaded guilty, Albarran averred, only because Attorney Donovan "pressed [him] to do so." *Id.* He asserted that he has "never lived" in the first-floor apartment at 501 Blatchley and has "no association" with that unit. *Id.* at 147.

In February 2017, Judge Bolden heard oral argument on the motion. He then denied the motion, citing the record evidence tying Albarran to the first-floor apartment. The court noted as well that Albarran had let nearly four months elapse

---

[8] In its opposition to Albarran's motion to withdraw his guilty plea, the government represented that, had Albarran gone to trial, Torrez was prepared to testify that on several occasions, Albarran's mother accused Torrez of "putting her son in prison," and that Albarran's girlfriend told Torrez that she "must testify" that she never saw Albarran at 501 Blatchley. Gov't App'x 164.

after receiving the report before seeking to withdraw his plea,[9] and found that the delay would cause substantial prejudice to the government, which had been prepared to go to trial in mid-September, when the plea was entered. The court also cited the thoroughness of Albarran's plea colloquy and noted that Albarran had confirmed expressly to the court during the plea hearing that he made his plea voluntarily. Accordingly, the District Court concluded, Albarran had failed to raise "any plausible concerns regarding the voluntariness of his guilty plea." *Id.* at 39. Applying Fed. R. Crim. P. 11(d)(2)(B), which governs plea withdrawals, the court determined that Albarran did not present any "fair and just reason" for withdrawing his guilty plea.[10] *Id.* at 35.

In June 2017, the District Court conducted Albarran's sentencing, and Albarran renewed his motion to withdraw his plea. The District Court again denied the motion and then sentenced Albarran principally to 85 months' imprisonment.

## DISCUSSION

### I.      The substantive reasonableness of Vasquez's sentence

We review all sentences for abuse of discretion, and will reverse for substantive unreasonableness only when the trial court's sentence "cannot be located within the range of permissible decisions." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008)

---

[9] So far as the available record discloses, in none of the pro se motions filed by Albarran between the end of September 2016 and January 2017 did Albarran seek to withdraw his plea.

[10] Fed. R. Crim. P. 11(d)(2)(B) provides in relevant part: "A defendant may withdraw a plea of guilty . . . after the court accepts the plea, but before it imposes sentence if the defendant can show a fair and just reason for requesting the withdrawal."

14

(en banc).[11] Although we do not "presume that the Guidelines range is reasonable," *United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014), a Guidelines sentence "will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances" in "the overwhelming majority of cases," *United States v. Perez-Frias*, 636 F.3d 39, 43 (2d Cir. 2011). In assessing the sentence imposed by a district court, we do not reweigh the relevant factors; rather, we evaluate only whether a factor "can bear the weight assigned it [by the District Court] under the totality of circumstances in the case." *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012).

In Vasquez's case, the District Court correctly calculated Vasquez's applicable Guidelines range as 121-151 months of imprisonment, and Vasquez does not contend otherwise. The transcript of the sentencing hearing reflects that, in deciding on a sentence, the District Court acknowledged the applicable range and then weighed the factors listed in 18 U.S.C. § 3553(a), including Vasquez's leadership of the heroin trafficking conspiracy, as relevant to its final sentencing decision. It further shows that the District Court considered Vasquez's difficult early life, in which he experienced abuse and homelessness, and his relatively short criminal history. Having done so, the District Court selected a Guidelines sentence primarily of 151 months' incarceration.

Vasquez urges that, in imposing this sentence, the District Court failed to afford adequate weight to his difficult childhood and the strong familial network made up of his mother, sister, and wife, which currently supports him. He asserts as well that his

---

[11] Unless otherwise noted, all internal alterations, quotation marks, and citations have been omitted from the quoted language, without further mention.

criminal history category (II), while low, still overstates the seriousness of his prior convictions.

Upon abuse of discretion review, we identify no error in the District Court's assessment of the section 3553(a) factors and imposition of this Guidelines sentence. Although Vasquez's childhood was undoubtedly searing, as an adult he led an extensive heroin trafficking conspiracy for more than one year. The District Court reasonably weighed the gravity of Vasquez's leadership in that conspiracy against his other history and characteristics. It also identified and considered Vasquez's mitigating circumstances: his "low" criminal history category, his troubled upbringing, and his "own struggles with substance abuse." Vasquez App'x 124-25. Speaking directly to Vasquez, Judge Bolden explained one element of his reasoning as follows: "[W]hile your family history may have been painful, today you and the heroin operation that you guided [have] been pouring salt in the still open wounds that has plagued members of your family." *Id.* at 124. The court fairly cited the harm that Vasquez and his operation had been causing to the community, including the death of a young person who used heroin bought from the Vasquez group. Although different judges might assess these factors differently, Vasquez points to no error in the District Court's understanding of the facts or the law. It is not within our mandate to reweigh the relevant factors.

We therefore affirm the judgment of the District Court as to Vasquez's incarceratory sentence of 151 months.

## II.    Albarran's motion to withdraw his guilty plea

We review a district court's denial of a motion to withdraw a guilty plea for abuse of discretion; we examine findings of fact made in connection with such a denial

16

for clear error and questions of law de novo. *See United States v. Rivernider*, 828 F.3d 91, 104 (2d Cir. 2016).

Under Federal Rule of Criminal Procedure 11, a defendant may "withdraw a plea of guilty or nolo contendere after the court accepts the plea, but before it imposes sentence if the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). In ruling on a plea withdrawal motion, courts consider whether the defendant "has raised a significant question about the voluntariness of the original plea." *United States v. Schmidt*, 373 F.3d 100, 103 (2d Cir. 2004). They may also consider:

> (1) whether the defendant has asserted his or her legal innocence in the motion to withdraw the guilty plea; (2) the amount of time that has elapsed between the plea and the motion (the longer the elapsed time, the less likely withdrawal would be fair and just); and (3) whether the government would be prejudiced by a withdrawal of the plea.

*Id.* at 102-03. The defendant "bears the burden of showing . . . valid grounds for withdrawal." *Rivernider*, 828 F.3d at 104.

As we have explained, "[t]he standard for withdrawing a guilty plea is stringent because society has a strong interest in the finality of guilty pleas, and allowing withdrawal of pleas not only undermines confidence in the integrity of our judicial procedures, but also increases the volume of judicial work, and delays and impairs the orderly administration of justice." *United States v. Rose*, 891 F.3d 82, 85 (2d Cir. 2018) (quoting *Schmidt*, 373 F.3d at 103). Accordingly, a defendant's "reevaluation of the government's case against him" does not justify withdrawal of a plea. *Schmidt*, 373 F.3d at 103.

We first address Albarran's claim of legal innocence. We then consider together the timing of Albarran's motion to withdraw and any prejudice to the government that would have resulted from granting such a motion. Finally, we turn to whether Albarran has raised a significant question about the voluntariness of his original plea. As set forth below, we conclude that Albarran has not shown that the District Court abused its discretion here.

### A. Legal innocence and factual basis for the plea

Albarran urges us to conclude that the private investigators' finding that he did not "reside" at 501 Blatchley in the relevant period shows that he did not constructively possess the two firearms retrieved from the first-floor apartment at that address and establishes his legal innocence as to Count 8. Albarran's arguments do not persuade us.

To establish a violation of 18 U.S.C. § 924(c) for possession of a firearm in furtherance of a drug trafficking offense, the government must prove that the defendant "possessed" the firearm and that the possession occurred "in furtherance of a drug trafficking crime." *United States v. Snow*, 462 F.3d 55, 62 (2d Cir. 2006). As was publicly explained to Albarran at least twice, at both the *Frye* hearing and the change-of-plea hearing, either actual or constructive possession of a firearm in furtherance of a drug trafficking crime will violate section 924(c). *United States v. Gaines*, 295 F.3d 293, 300 (2d Cir. 2002).

In this case, again as reviewed at the *Frye* hearing, the prosecution proceeded on a theory of constructive possession. To establish constructive possession, the government must demonstrate that the defendant "knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Facen*, 812 F.3d 280, 287 (2d Cir. 2016) (quoting

18

*United States v. Pelusio*, 725 F.2d 161, 167 (2d Cir. 1983)).[12] Constructive possession "may be shown by direct or circumstantial evidence," and "possession [of the item] need not be exclusive." *Gaines*, 295 F.3d at 300. Moreover, "[d]ominion, control, and knowledge may be inferred by a defendant's exclusive possession of the premises." *United States v. Finley*, 245 F.3d 199, 203 (2d Cir. 2001). Where more than one person occupies the premises, however, control over the premises is by itself insufficient to establish dominion and control over the contraband. Instead, to support a plea or conviction for constructive possession, the facts adduced must support "at least a plausible inference that the defendant had knowledge of *and* access to the illegal item." *United States v. De Leon*, 170 F.3d 494, 497 (5th Cir. 1999) (emphasis added); *see also United States v. Paulino*, 445 F.3d 211, 222 (2d Cir. 2006) ("As this court has long recognized, a defendant's knowledge and intent are crucial to determining whether he exercised constructive possession over an item.").

The Fifth Circuit's decision in *De Leon* is especially instructive. There, the court affirmed the jury's conviction of the defendant for unlawful possession of ammunition on a theory of constructive possession. *De Leon*, 170 F.3d at 497. Execution of a search warrant at the home of the defendant's girlfriend led to the discovery of ammunition at the home. The defendant argued on appeal that the government's evidence was insufficient to prove his dominion or control over the home and the ammunition found there. Rejecting that challenge, the court acknowledged that no one was found at the house when the search warrant was executed, and that no evidence suggested that the

---

[12] The test for constructive possession has been described with different formulations. *Compare United States v. Herrera*, 446 F.3d 283, 287 (2d Cir. 2006) (constructive possession involves "dominion and control" over the item) *with id.* (constructive possession involves "dominion or control" over the item). These differences are not material for our analysis.

19

house was the defendant's primary residence. Nevertheless, the Court held, the jury could find constructive possession based on other evidence tying De Leon to the residence and the ammunition. In particular, the discovery in the house of a parole document belonging to De Leon and a neighbor's testimony that De Leon visited his girlfriend at the residence supported an inference that De Leon "could come and go as he pleased and that he exercised dominion and control over the house." *Id.* As to the knowledge element, the court reasoned that the discovery of De Leon's thumbprint on a box of ammunition found in the house "would also lead a jury to reasonably infer that De Leon knew that the box was there and that he possessed control over it." *Id.*

- *Evidence supporting Albarran's constructive possession here*

We similarly conclude here that the evidence proffered by the government to tie Albarran to the firearms seized from 501 Blatchley was sufficient to support the guilty plea that he gave to the firearm possession count. First, Albarran himself told both a pretrial service officer (shortly after his arrest) and the probation officer (later) that his permanent address was 501 Blatchley. *See* PSR 2; Albarran App'x 150 (letter from Donovan to Albarran, dated November 2, 2016). In addition to Albarran's own admissions, Aida Torrez, the third-floor tenant, identified Albarran as the "sole resident" of the first-floor unit; indeed, she advised the police that she had seen Albarran there the night before they executed the warrant for his arrest at that location.[13] Gov't App'x 182. Law enforcement agents testified that they had themselves observed Albarran "in the immediate vicinity" of 501 Blatchley during the week before

_____

[13] Government agents contacted Torrez immediately before Albarran's trial was scheduled to begin. The government represents that she said she was prepared to testify to what she had previously told the officers.

20

they executed the search warrant. *Id.* at 176. Finally, Torrez's statements identifying Albarran and reporting that Albarran was regularly present at the building were corroborated, if modestly, by the agents' discovery in the first-floor apartment's bedroom of a personal document: one of Albarran's credit card bills. His general presence at the location might be explained, it is true, by his mother's residence on the second floor of the building, but her residence in a unit on a different floor does not explain the agents' discovery of Albarran's credit card bill in the first-floor bedroom. Taken together, the government's evidence, if adduced at trial, would have been sufficient for a jury to conclude that Albarran had dominion and control over the first-floor residence and its contents.

Furthermore, at his change-of-plea hearing, Albarran admitted under oath that he knowingly possessed the two firearms in furtherance of the charged drug trafficking crime. As we have often noted, statements made under oath at a plea allocution "carry a strong presumption of veracity." *United States v. Doe*, 537 F.3d 204, 213 (2d Cir. 2008). At Albarran's hearing, the government explained that the firearm count would require it to prove that "the defendant knowingly possessed[,] either actually or constructively, a firearm in furtherance of th[e] drug trafficking crime." Gov't App'x 73. Albarran then confirmed on multiple occasions during the hearing that he understood this concept. He never challenged the reasonable inference that he knew of both the drugs and the firearms that were found on the property and that were the subject of the crimes charged.

Albarran affirmed to the District Court that he understood "constructive possession" to require that he have "the *intention* and the ability to exercise dominion and control over something." *Id.* at 86 (emphasis added). Attorney Donovan further

21

explained the concept of constructive possession by offering an illustration regarding his own constructive possession over the items that he knew to be in his home, forty-five miles away from the courthouse. Shortly thereafter, Attorney Donovan asked whether Albarran understood the government's "claim that [Albarran] had constructive possession over . . . the two firearms that were seized at 501 Blatchley," to which Albarran responded, "Yes." *Id.* at 88. Albarran again answered in the affirmative when Judge Garfinkel pursued the matter, asking Albarran whether he had "the ability to exercise dominion and control over things that were in [the 501 Blatchley] apartment, right? You have the power [to] do that if you wanted to?" *Id.* Finally, when Albarran signed the plea agreement at the end of the hearing, he certified that he had reviewed and accepted its terms, including the provisions stating that (1) Albarran "underst[ood]" that an "essential[] element of the [firearms] offense" was that he "knowingly possessed a firearm," and (2) Albarran "acknowledge[d]" that "he possessed" the firearms "seized from the premises at 501 Blatchley." *Id.* at 39-40, 41.

Significantly, during these exchanges (and at the hearing generally), Albarran gave no recorded sign of confusion or lack of understanding. Indeed, Attorney Donovan described Albarran as "highly competent." *Id.* at 35. Moreover, nothing in the plea colloquy suggests that Albarran was ignorant of or surprised by the firearms' presence at 501 Blatchley, or that Albarran failed to appreciate the knowledge requirement of constructive possession when he admitted in the plea agreement that he "knowingly possessed" the seized firearms. *Id.* at 40-41. Thus, although his admission to the knowledge element of constructive possession could have been more explicitly extracted, we think it apparent from the magistrate judge's thorough plea colloquy that Albarran admitted to his knowledge, intention, and ability to exercise dominion and control over the two firearms—that is, to his constructive possession of the firearms.

22

In short, the government's proffered evidence, coupled with Albarran's admission that he constructively possessed the firearms, provides a sufficient factual basis for Albarran's guilty plea to Count 8. As this Court previously explained in *Maher*, Rule 11's requirement that the court assess the factual basis for a plea does not require that "the court be satisfied that a jury would return a verdict of guilty" or that the court "weigh evidence to assess whether it is even more likely than not that the defendant is guilty." *United States v. Maher*, 108 F.3d 1513, 1524 (2d Cir. 1997). Instead, Rule 11 "requires the court to assure itself simply that the conduct to which the defendant admits is in fact an offense under the statutory provision under which he is pleading guilty." *Id.* Here, were a jury to accept as fact the statements described by the government and admitted by Albarran at Albarran's change-of-plea hearing, "a guilty verdict would follow." *United States v. Juncal*, 245 F.3d 166, 171 (2d Cir. 2001). Rule 11's requirement that the court assess the factual basis for a plea "requires no more." *Id.*

- *Effect of the investigative report*

On appeal, Albarran does not challenge the factual basis for his plea as it existed at the time of the colloquy. Indeed, he appears to concede that he "acknowledged all of the facts to support the elements of the crime" during the change-of-plea hearing. Albarran Br. 38. Instead, Albarran contends principally that the conclusions presented in the investigative report fatally undermine the factual predicate for his earlier admissions that he constructively possessed the two firearms and provide a "fair and just" reason for withdrawing his plea.[14] He urges, in essence, that while the facts as

_____

[14] In the District Court, Albarran sought to withdraw his guilty pleas to both Count 1 and Count 8. His brief on appeal, however, focuses on Count 8, arguing that the investigative report severs his connection to 501 Blatchley and the firearms found in the first-floor apartment there.

presented in the plea colloquy supported his guilty plea, three conclusions of the investigative report invalidate those admissions. These are, first, the investigative report's conclusion that Albarran "resided" with his girlfriend on Fitch Street, not on Blatchley Avenue; second, that Torrez, when speaking with the private investigators, denied having identified Albarran by photograph; third, the investigators contacted two potential witnesses, Albarran's mother and girlfriend, who would testify that Albarran did not live in any of the apartments at 501 Blatchley. The report, Albarran now urges, eliminates any connection between him and 501 Blatchley, and precludes the government from demonstrating his constructive possession of the two firearms.

Albarran overstates the significance of the investigative report. Its principal finding—that Albarran resided on Fitch Street, not on Blatchley Avenue—does not unsettle the factual basis for his guilty plea. To begin, the evidence set forth in the report is far from conclusive. For example, the landlord of Albarran's Fitch Street apartment represented to the investigators that, to the best of his knowledge, Fitch was Albarran's "primary residence" during the relevant period of time. Albarran App'x 25. The report, however, also characterized the landlord as only "somewhat credible," and it further noted that the landlord had no documents to support his belief; that he did

---

Furthermore, the issue of Albarran's constructive possession of 501 Blatchley has no bearing that we can perceive or that he identifies on Albarran's admission to the charge in Count 1 that he conspired to possess with intent to distribute heroin. *See United States v. Jackson*, 335 F.3d 170, 182 (2d Cir. 2003) ("In drug conspiracies, the conspirators' agreement to produce narcotics, not the actual possession, sale or delivery of the drugs, is the essence of the crime.") (quoting *United States v. Hendrickson*, 26 F.3d 321, 333 (2d Cir. 1994)). As described above, the record contains transcripts of intercepted phone calls between Albarran and Vasquez in which the two discuss the price of drugs, and Albarran agrees to obtain drugs for Vasquez. In his brief on appeal, Albarran offers no basis for withdrawing his guilty plea on Count 1. We thus easily conclude that the District Court did not abuse its discretion in denying Albarran's motion as to that count.

not know whether Albarran's name was ever on the lease; and that Albarran's girlfriend (not Albarran) paid the landlord rent each month in cash. *Id.* at 24-25. Likewise, while Albarran highlights Aida Torrez's reported statement to investigators that she "denied telling the officers that [] Albarran resided [at 501 Blatchley]," he overlooks the report's very next sentence, which undercuts Torrez's credibility by noting that, when investigators "asked if [Torrez] ever provided any statements to law enforcement[,] she stated she was uncertain." *Id.* at 26.

The documentary evidence that the investigators gathered is similarly underwhelming. Although the investigators asked Albarran's girlfriend if she "could think of anything that could document that [] Albarran was residing at Fitch around the time of the arrest," she provided them with only a single letter from an insurance company that was addressed to Albarran at the Fitch Street address. *Id.* at 27. The investigators also acquired a photograph of Albarran's driver's license. This license, however, did not list either the Blatchley Avenue property or the Fitch Street property as Albarran's address, but instead named a third property located at 12 Clay Street, New Haven. Thus, far from "prov[ing] [Albarran's] residence at Fitch Street," Albarran Br. 9, the report's evidence on this matter was equivocal at best.

More importantly, however, permanent residency is not a prerequisite to constructive possession. Even if Albarran did not permanently reside at 501 Blatchley, he could nevertheless exercise sufficient dominion and control over the premises to support a finding of constructive possession. *See De Leon*, 170 F.3d at 497 (concluding that, although there was no evidence that the house was the defendant's primary residence, a jury could reasonably infer constructive possession based on other evidence tying the defendant to the premises and the contraband located there). Indeed,

25

government counsel highlighted precisely this point at the *Frye* hearing, when it correctly noted that because residence is not an element of constructive possession, the government did not think it necessary to show that Albarran "actually resided there [at 501 Blatchley]." Gov't App'x 29. The government's theory, instead, was "that he [Albarran] controlled that premises . . . to the point where he could conduct the activities that he was conducting there, and that he was associated with the premises in that way." *Id.* Because the government adequately substantiated this theory of constructive possession with evidence tying Albarran to 501 Blatchley, and in light of Albarran's admissions during the plea colloquy that he "knowingly ha[d] the power and the intention" to exercise control over the firearms, *Facen*, 812 F.3d at 287 (citation omitted), the District Court acted well within its discretion when it declined to withdraw Albarran's guilty plea based on the investigative report's conclusion about the location of Albarran's residence during the relevant period.

Albarran's other attacks on the government's case also fail to provide a "fair and just reason" for withdrawing his guilty plea. In his brief on appeal, Albarran asserts that he was only a "peripheral character" in the conspiracy, that he visited 501 Blatchley because his mother lived in the building, and that he was not present at the first-floor unit when agents raided the apartment. Albarran Br. at 33-35. He maintains as well that he told his pretrial officer that his address was 501 Blatchley only because his mother lived there, and not because he considered it to be his permanent residence. These are all assertions that, if factual, Albarran was well aware of when he decided to enter a guilty plea to both charges. That Albarran now is of the view that he might obtain a not guilty verdict does not establish "legal innocence" or provide an adequate reason to disturb his guilty plea. It certainly does not render the District Court's denial an abuse of discretion.

26

B.      Delay and prejudice

Albarran pleaded guilty on September 15, 2016, and received the investigative report on September 23. He moved to withdraw his plea on January 10, 2017.[15] The four-month lapse between his guilty plea and his motion to withdraw the plea further supports the District Court's exercise of discretion in denying Albarran's request. *See Doe*, 537 F.3d at 213 ("Whereas a swift change of heart may indicate a plea made in haste or confusion, the fact that the defendant waited five months to file his motion strongly supports the district court's finding that his plea was entered voluntarily."). The delay tends to fortify the conclusion that the report provided Albarran no real exoneration, factual or legal, on Count 8.

In addition, as the District Court pointed out, the delay prejudiced the government, which in mid-September had been poised for trial. In the four-month interim, the government reported, several key witnesses had moved and might no longer be available to testify at a trial. At oral argument on the motion to withdraw the plea, the government further represented that, as a result of the delay, the government's experts would need to re-familiarize themselves with the forensic analyses that they

---

[15] In his brief on appeal, Albarran asserts for the first time that he moved to withdraw his guilty plea in a pro se motion drafted by Albarran and filed by Attorney Donovan on October 27, 2016. As support for this assertion, Albarran submits an undated, unsigned, handwritten document. *See* Albarran App'x 141. The District Court docket shows that this document was submitted, not as a pro se motion to withdraw his guilty plea, but as an exhibit to his counseled motion to withdraw the plea that was filed by Attorney Gleason on January 10, 2017. *See* Dist. Ct. Dkt. No. 643-9. The counseled motion to withdraw the plea does not assert that Albarran ever filed the pro se motion; rather, it cites the pro se submission as evidence that Albarran was not satisfied with his guilty plea and had continued to research and plan his defense. *Id.* Accordingly, Albarran's claim that he moved to withdraw his guilty plea "shortly after it had been entered," Albarran Br. 15, is due little if any credence as it has no basis in the record.

had conducted for the case. (These included, for example, DNA experts). And, of course, the government would again need to prepare for trial, already having done so once. The District Court reasonably found that the government would be prejudiced by allowing the plea to be withdrawn.

C.     Ineffective assistance and voluntariness

In a different approach, Albarran urges that Attorney Donovan provided ineffective assistance of counsel, rendering his guilty plea involuntary and providing an additional basis for withdrawing his plea. In particular, he faults Attorney Donovan for recommending that Albarran plead guilty without having earlier undertaken an independent investigation into the details of Albarran's connection to the 501 Blatchley apartment. On direct appeal, the argument fails.

Where a motion to withdraw a plea argues involuntariness, the defendant "must raise a significant question about the voluntariness of the original plea." *Doe*, 537 F.3d at 211. The record demonstrates that Albarran has not met that standard. At both the *Frye* hearing and the change-of-plea hearing, the District Court reminded Albarran that he had a right to proceed to trial and that he was under no obligation to plead guilty. Albarran affirmed at the plea hearing that his decision to plead guilty was a voluntary one. The text of the plea agreement that he signed also contains his representation that he was pleading guilty "freely and voluntarily." Gov't App'x 45.

Albarran now urges that, notwithstanding these repeated declarations to the contrary, Attorney Donovan pressured him into pleading guilty. At the *Frye* hearing, Attorney Donovan expressed doubt about the strength of Albarran's case. Albarran also provided the District Court with a letter from Attorney Donovan in which Attorney Donovan explains, correctly, that entering into the plea agreement would spare

28

Albarran from exposure to a 10-year mandatory minimum sentence. He argues that these reflect coercion. But it cannot reasonably be disputed that an attorney's "blunt rendering of an honest but negative assessment of appellant's chances at trial, combined with advice to enter the plea, [does not] constitute improper behavior or coercion that would suffice to invalidate a plea." *Juncal*, 245 F.3d at 172.

In any event, the present record is insufficient to overcome the "strong presumption of accuracy" that we must afford Albarran's own sworn testimony that his plea was voluntary. *Id.* at 171 (noting that testimony at a plea hearing "carries such a strong presumption of accuracy that a district court does not, absent a substantial reason to find otherwise, abuse its discretion in discrediting later self-serving and contradictory testimony as to whether a plea was knowingly and intelligently made").[16]

\* \* \*

In short: Albarran has not carried his burden of showing a fair and just reason for withdrawing his guilty plea. He has not sufficiently demonstrated his legal innocence or raised a significant question about the voluntariness of his original plea, and Judge Bolden reasonably concluded that granting Albarran's belated motion to withdraw would prejudice the government. Thus, in the absence of any valid grounds for withdrawal, we conclude that the District Court acted well within the permissible bounds of its discretion when it denied Albarran's motion to withdraw his guilty plea.

---

[16] Our decision today does not, however, foreclose Albarran from raising an ineffective-assistance claim in a habeas petition filed under 28 U.S.C. § 2255. *See Rivernider*, 828 F.3d at 106.

## CONCLUSION

For the reasons set forth above, we conclude that the District Court did not abuse its discretion either when it sentenced Vasquez to a Guidelines sentence of 151 months' incarceration or when it denied Albarran's motion to withdraw his guilty plea. The judgments of the District Court are therefore **AFFIRMED**.